**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.      07-cv-02065-WDM-KMT

DELL MELLETTE,
MARVIN LORD,
LEONARD RICHEY,

Plaintiffs,

v.

MICHAEL BRANCH,
FORD JOHNSON
CINDY JOHNSON,
MARK JOHNSON,
JAMES LAKE a.k.a LES LAKE,
JOHN GRAVES,
JLC TECHNOLOGIES, LLC a.k.a. JLC OS3, L.L.C.

Defendants.

_____

**AMENDED COMPLAINT AND JURY DEMAND**
_____


Plaintiffs, Dell Mellette, Marvin Lord, and Leonard Richey, individuals residing in the

State of Colorado, by and through their attorneys, The Law Offices of Thomas V. Hoeflinger,

LLC, submit this Amended Complaint for the purpose of correcting the caption to reflect

properly the parties to this action, and for the purpose of adding both federal and state causes of

action, as they arise under the same nucleus of facts as the current federal causes of action.  In

furtherance thereof, Plaintiffs allege for Plaintiffs' Amended Complaint as follows:

## NATURE OF ACTION, JURISDICTION, AND VENUE

This is a Civil Action:

1.      Plaintiffs seek damages from Defendants for the actions of Defendants described below in paragraphs eighteen (18) through one hundred and nineteen (126);

This is a Federal Question Matter:

2.      Plaintiffs have the right to sue in the United States District Court, under 18 U.S.C. § 1961, 18 U.S.C. § 1962, 18 U.S.C. § 1964(a) and (c), and 15 U.S.C. § 78(a);

This is a Supplemental Jurisdiction Matter:

3.      Plaintiffs have the right to sue in the United States District Court, under 28 U.S.C. 1367 for state causes of action arising from the same nucleus of operative facts;

a.      Therefore, the basis for this Court's jurisdiction regarding the state causes of action is based *separately* upon Supplemental Jurisdiction;

This is a Personal Jurisdiction Matter:

4.      This Court has personal jurisdiction over the Defendants and venue is proper in the District of Colorado because many of the Defendants' acts and transactions constituting of the violations detailed herein occurred in the District of Colorado;

5.   Defendants, directly and indirectly, have made use of the means and instrumentalities of interstate commerce, the means and instruments of transportation and communication in interstate commerce, and the mails, in connection with the acts, practices, and courses of business set forth in this Complaint;

6. Defendants have, directly and indirectly, purposely availed themselves of the opportunities and protections of the State of Colorado, in connection with the acts, practices, and courses of business set forth in this Complaint;

7. Defendants have maintained minimum contacts within the State of Colorado through the use of their agents, in connection with the acts, practices, and courses of business set forth in this Complaint;

**PARTIES**

Dell Mellette:

8.      Dell Mellette is an individual domiciled in the state of Colorado and resides at 295 Meadowbrook Place, Pagosa Springs, Colorado 81147;

Marvin Lord:

9.      Marvin Lord is an individual domiciled in the state of Colorado and resides at 275 Tieria Del Oro, Pagosa Springs, Colorado 81147;

Leonard Richey:

10.      Leonard Richey is an individual domiciled in the state of Colorado and resides at 3600 County Road, No. 335, Pagosa Springs 81147;

JLC Technologies a.k.a JLC OS3:

11.      JLC Technologies, LLC; herein after referred to as "JLC"  is a Texas Limited Liability Company whose principal place of business is 12031 State Highway 155N, Tyler, Texas 75708;

Michael Branch:

12.      Defendant Michael Branch is a resident of the State of Colorado, domiciled in Pagosa Springs, Colorado, and operated both as an agent of JLC, and as the General Partner in each of

the partnerships discussed herein; each created pursuant to Lease and Purchase agreements with

JLC;

Ford Johnson:

13.     Defendant Ford Johnson is Chief Executive Officer and registered agent of JLC and is

domiciled in the State of Texas;

Cindy Johnson:

14.     Defendant Cindy Johnson is the Secretary and bookkeeper of JLC and is domiciled in the

State of Texas;

Mark Johnson:

15.     Defendant Jack Johnson is the Chief Operating Officer of JLC and is domiciled in the

State of Texas;

James Lake:

16.     Defendant James Lake is a sales representative for JLC and is domiciled in the State of

Texas;

John Graves:

17.     Defendant John Graves is the attorney who drafted all contracts associated with this

cause of action; is a sales representative for JLC; and is domiciled in the State of Texas;


## BACKGROUND AND GENERAL ALLEGATIONS

18.     In January and February 2004, Ford Johnson purported to create a new technology that

would enhance crude oil, purify diesel, refine sour water, refine bio sludge, remove heavy metals

and salts from water, and reconstitute fluids to the original manufacturer's specifications;

19.     Beginning in January 2004 and continuing through August 2006, JLC, though its agents, Defendants Ford Johnson, James Lake, and Michael Branch; sought investors in Pagosa Springs, Colorado to fund this new technology;

20.     When seeking investors in between February 2004 and October 2004, JLC obtained investment capital by misrepresenting the abilities of this technology; specifically representing to Plaintiffs in that this machine had been issued and was purifying oil with Conoco Oil Company (ConocoPhillips, Inc.);

21.     When seeking investors between February 2004 and October 2004, JLC, and its agents, further obtained investment capital by misrepresenting to investors JLC possessed contracts and was concurrently securing additional contracts for this technology with foreign and domestic companies;

22.     Through its agents, JLC approached approximately two-hundred and forty-seven (247) investors in Colorado to form approximately sixty-one (61) separate limited partnerships;

23.     Based on this arrangement, investors could individually or aggregately invest in a "Midas Limited Partnership";

24.     Initially, JLC, through Defendants Les Lake, Ford Johnson, and Michael Branch, offered to sell these limited partnerships for approximately $250,000.00;

25.     JLC, by and through their agents Michael Branch and Ford Johnson, represented to Plaintiffs they would only sell twenty (20) Limited Partnerships to a select few who invested early;

26.     JLC, by and through their agent Michael Branch, represented to Plaintiffs no profits would be distributed until each investor received, at a minimum, the full amount of their investment;

27.     JLC, by and through their agent Michael Branch, represented to Plaintiffs that their full investment would be reimbursed within a six (6) to ten (10) month period;

28.     Approximately one (1) month after releasing an offering for twenty (20) Limited Partnership, JLC; by and through their agents Michael Branch, Les Lake, and Ford Johnson, released approximately forty-one (41) additional Limited Partnerships for purchase by investors over the next eight (8) months;

29.     Upon information and belief, the amount JLC requested of investors was later increased to as much as $500,000.00, per partnership;

30.     Based on the structure of this arrangement, the money given by each investor would be used by each individual limited partnership to purchase the technology, which is specifically referred to as a "QLXM Molecular Separation System";

31.     After purchasing and/or leasing each "QLXM Molecular Separation System" each partnership was instructed to allow JLC to operate each machine through leasing contracts JLC purported to possess, and was imminently securing with domestic and foreign companies;

32.     Based on these separate contracts, JLC would lease these machines to various companies and share the proceeds of these third-party contracts with each individual partnership;

33.     Defendants claimed to those investing in a limited partnership that based on contracts already secured; and other contracts about to be secured, their investments would return significant amounts of money over a span of fifteen (15) years;

34.     Based upon the amount of money each investor contributed; per limited partnership, each investor was promised a specific percentage, to be paid to that investor in monthly returns over this period of time;

35.     Defendants, by and through their agents Michael Branch, Les Lake, and Ford Johnson, released this false information to present investors and prospective investors through emails, telephone calls, flyers, presentations and prospectuses;

36.     By doing so, Plaintiffs allege Defendants violated U.S.C. S. § 1956(h) dozens, if not hundreds of times;

37.     Each of these fraudulent emails, telephone calls, fliers, presentations, and prospectuses were sent from various Defendants, including but not limited to Michael Branch, Les Lake, and Ford Johnson;

38.     Some of these communications were sent from the State of Texas, while others were sent from agents of JLC in the State of Colorado;

39.     Each of these misrepresentations were directed at residents of the State of Colorado;

40.     Specifically, Defendants Michael Branch, Les Lake and Ford Johnson claimed in myriad of telephone calls, letters, emails, and presentations; JLC possessed active contracts, and/or was close to securing contracts in areas of the world including, but not limited to Norway, Owentown, Alabama, Australia and the Middle East;

41.     All information provided by JLC was released for the sole purpose of misleading individuals who already invested capital into their respective Midas Limited Partnerships and to fraudulently induce other investors to buy into additional Midas Limited Partnerships;

42.     Plaintiffs became limited partners in various Midas Limited Partnerships to include Midas Limited Partnership Number Six (6), Thirteen (13), Sixteen (16), Thirty-Four (34), Thirty-Six (36), Thirty-Seven (37), and Sixty (60);

43.     Plaintiffs' involvement in the scheme began in January 2004, when Defendant Michael Branch represented to Plaintiff, Marvin Lord Conoco Oil and JLC possessed an on-going relationship whereby Conoco Oil was using, and intended to use additional, QLXM Molecular Separation Systems owned by JLC;

44.     Defendants shared this information with Plaintiff Marvin Lord in order to secure an investment from him, for this project;

45.     In connection with this, Defendant Michael Branch claimed to have hired a private investigator for three-thousand, five hundred dollars ($3,500.00) to research the claims and history of Ford Johnson and JLC;

46.     Defendant Michael Branch represented the results of this investigation showed Ford Johnson did not have criminal or civil litigations in his background, and that JLC was, in fact, engaged in contractual relations with Conoco Oil;

47.     Ford Johnson first gave a presentation, that was arranged by Defendant Michael Branch, to a limited group of potential investors on or about February 1, 2004, at Bob's Cabin, in Pagosa Springs, Colorado;

48.     During this presentation, for which Plaintiff Marvin Lord was present, Ford Johnson represented to approximately 50 potential investors that JLC possessed an on-going relationship with Conoco Oil, where approximately three (3) QLXM Molecular Separation System had been successfully purifying oil for this company for an extended period of time;

49.     During this presentation to potential investors, Ford Johnson also represented twenty (20) initial machines for which JLC sought investment would be used for this on-going contract with Conoco Oil;

50.     Further, during this presentation, Ford Johnson stated to investors any monies invested would receive a return by August 2004;

51.     Lastly, during this presentation, Ford Johnson guaranteed to potential investors that each investor would receive a full return on their investment, within ten (10) months;

<u>PLAINTIFF MARVIN LORD</u>

52.     In light of the representations of Defendants Branch and Ford, Marvin Lord became the first of the Plaintiffs to invest money into a Midas Limited Partnership when he invested twenty-five thousand dollars ($25,000.00) into Midas Limited Partnership Number Six (6) in February 2004;

53.     In March 2004, Plaintiff Marvin Lord, and other investors were informed by Defendants, Ford Johnson and Michael Branch, that this proposed deal with Conoco Oil turned sour;

54.     Ford Johnson represented the reason for this failed relationship was because Conoco Oil did not want to pay the amount of money Ford Johnson requested for the lease of these machines;

55.     In April 2004, Ford Johnson informed present investors and potential investors that contractual relations with Conoco Oil was again a reality and that additional money would be needed for additional machines, to be used in conjunction with this contract, and with other contracts JLC currently possessed or was working on obtaining;

56.     Further, at this time, Defendants claimed JLC possessed active contracts with the United States Department of Defense, was involved in oil companies including, but not limited to BP; and was closing major transactions with Middle Eastern Oil Companies for use of these machines;

57.     By May 8, 2004, Plaintiff Marvin Lord wanted to see the plant in Tyler, Texas, and view the machines Ford Johnson promised would make the investors of Pagosa Springs so much money;

58.     Given this, Plaintiff Lord visited the JLC Plant in Tyler Texas;

59.     During this visit, Plaintiff Lord viewed a couple machines, none of which had a legible serial number, and interviewed employees of the plant, who all assured him the machines were successfully running at Conoco Oil;

60.     In response to these many representations, Marvin Lord again invested five thousand dollars ($5,000.00) in Midas Partnership Number Sixteen (16) and thirty-five thousand dollars ($35,000.00) into Midas Limited Partnership Number Thirteen (13) in May 2004;

61.     In July 2004, Marvin Lord received twelve-thousand dollars ($12,000.00) from JLC and was informed this was a return based on a signing bonus JLC received from Stat Oil Company, in Norway, with whom JLC had entered into contractual relations;

62.     Spurred on by this return, and the promise of greater returns, Plaintiff, Marvin Lord re-invested seventy-thousand dollars ($70,000.00) into Midas Limited Partnership Number Thirty-Four (34), in August 2004;

63.     During this time, Ford Johnson gave another presentation in Pagosa Springs on August 21, 2004 that was attended by approximately two hundred (200) investors and potential investors;

64.     At this presentation, Defendant Ford Johnson distributed a JLC Technologies Review of Company and Technology Capabilities (attached as Exhibit A);

65.     On or about September 25, 2004, Ford Johnson spoke with Michael Branch and informed Michael Branch to release information to present and future investors;

66.     On or about October 1, 3005, Michael Branch released this information to present and future investors;

67.     This information included the representation that JLC secured a contract with Stat Oil in Norway for sixty (60) Midas Units;

68.     Further, this information included the representation that, due to this contract, two hundred and forty-six (246) partners in Pagosa Springs would share in thirty-six million dollars ($36,000,000.00) per year and that the net worth of these partners had increased two-hundred and thirty-one million dollars ($231,000,000.00).

69.     Lastly, Michael Branch informed present and future investors Defendants would not make any profit until the investors in these Midas Partnerships made money;

70.     In reliance on the information above, Plaintiff, Marvin Lord invested an additional twelve-thousand dollars ($12,000.00) in Midas Limited Partnership Number Sixty (60) in October 2004;

<u>PLAINTIFF LEONARD RICHEY</u>

11

71.     Plaintiff, Leonard Richey originally invested one hundred and twenty-five thousand dollars ($125,000.00) in Midas Limited Partnership Number Six (6), in March 2004;

72.     Based upon the representations of Defendants, Plaintiff Leonard Richey received approximately fifty-nine thousand dollars ($59,000.00) when JLC received a signing bonus for a contract JLC secured in Norway in August 2004;

73.     JLC purportedly leased the QLXM Molecular Separation System secured by Midas Limited Partnership Number Six (6) as part of this contract in Norway;

74.     After receiving such a significant return on his investment in a four (4) month period, Plaintiff Leonard Richey decided to invest an additional thirty-three thousand, six hundred and sixty dollars ($33,660.00) into Midas Limited Partnership Number Thirty-Six (36) in July 2004;

75.     Further, after receiving these monies, Plaintiff Leonard Richey decided to invest an additional twenty-six thousand, three hundred and sixty dollars ($26,360.00) into Midas Limited Partnership Number Thirty-Seven (37) in July 2004;

<u>PLAINTIFF DELL MELLETTE</u>

76.     Plaintiff Dell Mellette originally invested fifteen thousand dollars ($15,000.00) in Midas Limited Partnership Number Thirteen (13);

77.     After hearing of the significant returns Leonard Richey and Marvin Lord received on their original investments, and after receiving the letter Defendant Michael Branch released on or about October 1, 2004, Dell Mellette again invested fifty-thousand dollars ($50,000.00) in Midas Limited Partnership Number Sixty (60) in October 2004;

## MIDAS LIMITED PARTNERSHIPS

78.     In every Midas Limited Partnership, Defendant Michael Branch was named as General

Partner;

79.     In every Midas Limited Partnership Agreement, Defendant Michael Branch was given a

twenty-five percent (25%) ownership on each limited partnership;

80.     In each Midas Limited Partnership, Plaintiff(s) is/are limited partners;

81.     The terms of every limited partnership, lease and purchase agreements were identical,

save the amount of investment required and serial number of the machine each limited

partnership leased and purchased;

82.     Every limited partnership agreement gave to Defendant Michael Branch, sole power to

act on behalf of the partnership, and limited any power to do so, to Plaintiffs and other investors;

83.     Pursuant to the powers granted him in the Midas Limited Partnership Agreements,

Defendant Michael Branch was entrusted to act with the best interest of the Plaintiffs, when

contracting with JLC;

84.     Pertinent to this case, Defendant, Michael Branch, acting in his capacity as General

Partner, signed all Lease Agreements and Purchase Agreements with Defendant, JLC, for Midas

Limited Partnership Numbers Six, Thirteen, Sixteen, Thirty-Four, Thirty-Six, Thirty-Seven, and

Sixty;

85.     Each agreement signed on the part of Plaintiffs, by Defendants stated, in consideration

for payment on the part of Plaintiffs, Defendant, JLC will manufacture and deliver one treatment

system to the investors of each partnership;

86.     Specifically, each agreement specified Defendant, JLC would manufacture one treatment system utilizing JLC QLXM Technology and would further:

   a.  Manufacture a trailer mounted treatment "QLXM Molecular Separation System" upon payment of Plaintiffs' money;

   b.  Deliver this complete with electrical distribution and air compression/air treatment required for operational requirements;

   c.  Configure each system, capable and ready to treat a minimum of 50 gallons per minute of water or a minimum of 15 gallons per minute of slop oil/sludge;

   d.  Configure each system, to include four separation stages (first stage: 100.00 micron, second stage: 1.00 micron, third stage: 0.50 micron; fourth stage: 0.1 micron). Each system would also include concentrators on the first three stages;

   e.  Deliver each system, complete with media cartridges required to meet the preceding stage requirements and delivered with spare cartridges required to equip all separation pods with either 10.00 micron, 1.00 micron, 0.5 micron and 0.10 micron grade cartridges for total system parallel operations;

   f.  Construct each system for operations in explosion hazard;

   g.  Construct each system with 316L stainless steel with seals composed of viton

   h.  Deliver each system, complete with software;

87.     Based on the Lease and Purchase Agreement entered into by Midas Limited Partnership Number Six (6), JLC was required to manufacture to the specifications above, and deliver a "QLXM Molecular Separation System" with serial number Q100508itsc;

88.     Based on the Lease and Purchase Agreement entered into by Midas Limited Partnership Number Thirteen (13), JLC was required to manufacture to the specifications above, and to deliver a "QLXM Molecular Separation System" with serial number Q100715itsc;

89.     Based on the Lease and Purchase Agreement entered into by Midas Limited Partnership Number Sixteen (16), JLC was required to manufacture to the specifications above, and to deliver a "QLXM Molecular Separation System" with serial number Q100818itsc;

90.     Based on the Lease and Purchase Agreement entered into by Midas Limited Partnership Number Thirty-Four (34), JLC was required to manufacture to the specifications above, and to deliver a "QLXM Molecular Separation System" with serial number Q101036itsc;

91.     Based on the Lease and Purchase Agreement entered into by Midas Limited Partnership Number Thirty-Six (36), JLC was required to manufacture to the specifications above, and to deliver a "QLXM Molecular Separation System" with serial number Q101038itsc;

92.     Based on the Lease and Purchase Agreement entered into by Midas Limited Partnership Number Thirty-Seven (37), JLC was required to manufacture to the specifications above, and to deliver a "QLXM Molecular Separation System" with serial number Q101039itsc;

93.     Based on the Lease and Purchase Agreement entered into by Midas Limited Partnership Number Sixty (60), JLC was required to manufacture to the specifications above, and to deliver a "QLXM Molecular Separation System" with serial number Q101110itsc;

94.     Upon information and belief on the part of Plaintiffs, no QLXM Molecular Separation System was ever manufactured and/or manufactured to the specifications above;

95.     Upon information and belief on the part of Plaintiffs, no QLXM Molecular Separation System, with the above serial numbers were ever manufactured and/or manufactured to the specifications above, as required by the Purchase and Lease Agreements;

96.     Upon information and belief on the part of Plaintiffs, no action on the part of Defendants illustrate that Defendant delivered QLXM Molecular Separation Systems, with these serial numbers, to Plaintiffs and/or to other companies for lease;

97.     Plaintiffs allege, based on the above, Defendants also violated U.S.C. S. § 1957 and or 18 U.S.C. § 1341 and or 18 U.S.C. § 1343; each constituting predicate acts through which these investments were obtained from Plaintiffs;

<u>RESCISSION AGREEMENTS</u>

98.     Plaintiffs entered into Rescission Agreements for each of the Midas Limited Partnerships with Defendant JLC whereby Plaintiffs and Defendant JLC would to mutually revise the Purchase Agreements and rescind the Lease Agreements previously executed by them and to replace the Lease Agreements executed in 2004 with the Rescission Agreement;

99.     Based on this Rescission Agreement the parties to these agreements would mutually release each other from all liability and responsibility arising out of the prior Lease Agreements;

100.    In consideration for this, JLC and Ford Johnson would deliver to each respective Midas Limited Partnership one QLXM Molecular Separation System on or before the date of August 21, 2006;

101.    Defendants JLC and Ford Johnson failed to transfer these QLXM Molecular Separation System on or before the date of August 21, 2006 to the Midas Limited Partnerships and/or failed to manufacture and/or lease these Systems to companies, pursuant to this agreement;

**FIRST CAUSE OF ACTION**

(*Violation of the Racketeer Influenced and Corrupt Organizations Act*)

102.    Defendants conspired to procure investments from Plaintiffs, and others, through an elaborate scheme of racketeering activity involving emails, telephone calls, and presentations; misrepresenting the abilities and economic viability of JLC's QLXM Molecular Separation System;

103.    Through misrepresentations made by Defendants, Plaintiffs were induced into investing approximately $250,000.00 so that they may become members of Midas Limited Partnerships Numbers Six, Thirteen, Sixteen, Thirty-Four, Thirty-Six, Thirty-Seven, and Sixty;

104.    The Defendants as "persons" were employed by or associated with Defendant, JLC, which is a corporation affecting interstate commerce;

105.    As persons associated with Defendant, JLC, each Defendant participated in the conduct of the affairs of this enterprise through a pattern of racketeering activity consisting of at least two acts of racketeering activity;

106.    This pattern of racketeering activity was directed at Plaintiffs over the course of three years, and included hundreds of instances of fraudulent inducement and misrepresentation that were not limited to Plaintiffs, but included like activity both targeting and affecting approximately 247 members of Plaintiffs' community;

107.    Plaintiffs were economically and non-economically damaged due to the actions of Defendants;

## SECOND CAUSE OF ACTION
*(Violation of the Anti-Fraud Provisions of the Securities Exchange Act of 1934, 10b(5))*

108.   Plaintiffs incorporate all of the above allegations;

109.   Defendants defrauded Plaintiffs through the use of email, telephone, internet, and

personal representation;

110.   Defendants further made any untrue statement of material facts and/or omitted material

facts necessary in order to make the statements;

111.   Defendants further engaged in acts, practices and a course of business which operated as

a fraud and/or deceit upon Plaintiffs;

112.   Defendants' fraud and/or deceit were justifiably relied upon by Plaintiffs when plaintiffs

invested into limited partnerships;

113.   These limited partnerships served as a means through which Defendants secured

Plaintiffs' investments;

114.   Plaintiffs were economically and non-economically damaged due to the actions of

Defendants;

## THIRD CAUSE OF ACTION
*(Fraud)*

115.   Plaintiffs incorporate all of the above allegations;

116.   Defendants engaged in a false representation of a material existing fact, or

misrepresented a material existing fact made with a reckless disregard of its truth or falsity; or a

concealed a material existing fact that in equity and good conscience should be disclosed when it

represented to Plaintiffs that the technology in question could enhance crude oil, purify diesel, refine sour water, refine bio sludge, remove heavy metals and salts from water, and reconstitute fluids to the original manufacturer's specifications;

117.    Defendants further engaged in a false representation of a material existing fact, or misrepresented a material existing fact made with a reckless disregard of its truth or falsity; or a concealed a material existing fact that in equity and good conscience should be disclosed when it represented to Plaintiffs that Defendants possessed active contracts, or was close to securing contracts including, but not limited to Norway, Owentown, Alabama, Australia and the Middle East;

118.    Defendants further engaged in a false representation of a material existing fact, or misrepresented a material existing fact made with a reckless disregard of its truth or falsity; or a concealed a material existing fact that in equity and good conscience that should have been disclosed when it represented to Plaintiffs Defendants possessed active contracts with the United States Department of Defense, was involved in oil companies such as BP and was closing major transactions with Middle Eastern Oil Companies for use of these machines;

119.    When making these representations to Plaintiffs, Defendants knew these the representations were false; possessed utter indifference to its truth or falsity; or knew that a material fact concealed in equity or good conscience should have been disclosed;

120.    Plaintiffs were ignorant of the falsity of the representation or of the existence of the facts concerned;

121.    Defendants made these representation or concealments with the intention that it would be induce Plaintiffs to invest in Midas Limited Partnerships and JLC technologies; and

122.   Reliance on the part of Plaintiffs was justifiable;

123.   Action in reliance to these representations and concealments and on the part of Plaintiffs

resulted in economic and emotional damage to Plaintiffs;

## FOURTH CAUSE OF ACTION
(*Constructive Fraud*)

124.   Plaintiffs incorporate all of the above allegations;

125.   Defendants concealed; orally, in writing, and in conduct, past and present facts and/or

failed to disclose past or present facts that Defendants had a duty to disclose to Plaintiffs;

126.   These facts were material when Plaintiffs decided to invest money into Midas

Partnerships Numbers Six, Thirteen, Sixteen, Thirty-Four, Thirty-Six, Thirty-Seven, and Sixty;

127.   When concealing these facts and/or failing to disclose facts the Defendants had a duty to

disclose, Defendants intended to create a false impression of the actual facts in the mind of the

Plaintiffs;

128.   Defendants intended that Plaintiffs invest money in Midas Partnership Numbers Six,

Thirteen, Sixteen, Thirty-Four, Thirty-Six, Thirty-Seven, and Sixty; knowing Plaintiffs might not

have invested in these partnerships if Plaintiffs knew the actual facts;

129.   Plaintiffs invested money into Midas Partnership Numbers Six, Thirteen, Sixteen, Thirty-

Four, Thirty-Six, Thirty-Seven, and Sixty; relying on the assumption that Defendant JLC's

technology worked as Defendants represented and/or relying on the assumption that Defendant

JLC possessed contracts or would possess contracts in the near future with the United States

Government and with foreign oil companies;

130.   Plaintiffs' reliance was justified;

131.   This reliance caused economic, non-economic, and emotional damage to Plaintiffs;

## FIFTH CAUSE OF ACTION
### (*Civil Conspiracy*)

132.   Plaintiffs incorporate all of the above allegations;

133.   Defendants sought investment capital from Plaintiffs when Defendants approached Plaintiffs;

134.   At this time Defendants represented Defendant JLC possessed technology that could enhance crude oil, purify diesel, refine sour water, refine bio sludge, remove heavy metals and salts from water, and reconstitute fluids to the original manufacturer's specifications and/or when Defendants represented to Plaintiffs Defendants possessed active contracts with the United States Department of Defense, was involved in oil companies such as BP and was closing major transactions with Middle Eastern Oil Companies for use of this technology;

135.   Defendants agreed to approach Plaintiffs and to make these representations in order to induce Plaintiffs to invest their monies;

136.   In furtherance this course of action, one or more unlawful acts were performed to accomplish a this goal and/or one or more lawful acts; as outlined in this complaint, were performed to accomplish this goal; and

137.   Plaintiffs were proximately damaged both economically and non-economically due to this course of action;

**SIXTH CAUSE OF ACTION**
(*Breach of Lease Agreement Contracts*)

138.    Plaintiffs incorporate all of the above allegations;

139.    Plaintiffs entered into Lease Agreements with Defendants whereby Defendants, upon receipt of monies paid by Plaintiffs, would manufacture and ship QLXM Molecular Separation Systems to Plaintiffs or a company for lease, within 60 days;

140.    Plaintiffs performed their obligations pursuant to these contracts when they paid monies obligated pursuant to this Lease Agreement;

141.    Defendants failed to perform their obligations on these contracts when they failed to transfer a QLXM Molecular Separation System to the Midas Limited Partnerships and/or when they failed to manufacture and/or lease these Systems to companies, as promised;

142.    Defendants' failure to perform on the contract caused economic and non-economic damage to Plaintiffs;

**SEVENTH CAUSE OF ACTION**
(*Breach of Purchase Agreement Contracts*)

143.    Plaintiffs incorporate all of the above allegations;

144.    Plaintiffs entered into Purchase Agreements with Defendants whereby Defendants, upon receipt of monies paid by Plaintiffs, would manufacture and ship QLXM Molecular Separation Systems to Plaintiffs or a company for lease, within 60 days;

145.    Plaintiffs performed their obligations pursuant to these contract when they paid monies obligated pursuant to these Purchase Agreements;

146.    Defendants failed to perform on the contract when they failed to transfer a QLXM

Molecular Separation System to the Midas Limited Partnerships and/or when they failed to

manufacture and/or lease these Systems to companies, as promised;

147.    Defendants' failure to perform on the contract caused economic and non-economic

damage to Plaintiffs;

**EIGHTH CAUSE OF ACTION**
(*Breach of Rescission Agreement Contracts*)

148.    Plaintiffs incorporate all of the above allegations;

149.    Plaintiffs entered into Rescission Agreements with Defendants whereby Plaintiffs and

Defendants would to mutually revise the Purchase Agreements and rescind the Lease

Agreements previously executed by them and to replace said Lease Agreements with the

Rescission Agreement;

150.    Based on this Rescission Agreement the parties to these agreements would mutually

release each other from all liability and responsibility arising out of the prior Lease Agreements;

151.    In consideration for this, JLC and Ford Johnson would deliver to each respective Midas

Limited Partnership one QLXM Molecular Separation System on or before the date of August

21, 2006;

152.    Defendants failed to perform on the contract when they failed to transfer a QLXM

Molecular Separation System on or before the date of August 21, 2006 to the Midas Limited

Partnerships and/or when they failed to manufacture and/or lease these Systems to companies, as

promised;

153.    Defendants' failure to perform on the contract caused economic and non-economic damage to Plaintiffs;

## NINTH CAUSE OF ACTION
*(Breach of Fiduciary Duties as to Michael Branch)*

154.    Plaintiffs incorporate all of the above allegations;

155.    Defendant Michael Branch, as General Partner of Midas Group Number Sixty, LLP, owed a legal duty to disclose material facts known by him to the Plaintiffs concerning representations Defendants were making with regard to the QLXM Molecular Separation System and with regard contracts Defendants claimed to have secured or were about to secure;

156.    Defendant, Michael Branch breached his duty to Plaintiffs when he negligently misrepresented Defendants possessed technology that could enhance crude oil, purify diesel, refine sour water, refine bio sludge, remove heavy metals and salts from water, and reconstitute fluids to the original manufacturer's specifications;

157.    Defendant Michael Branch further breached his duty to Plaintiffs when Defendant Michael Branch represented to Plaintiffs Defendants possessed active contracts with the United States Department of Defense, was involved in oil companies such as BP and was closing major transactions with Middle Eastern Oil Companies for use of this technology;

158.    Plaintiffs were economically and non-economically injured due to this breach;

## TENTH CAUSE OF ACTION
*(Negligent Misrepresentation)*

159.    Plaintiffs incorporate all of the above allegations;

160.    Defendants owed a legal duty to the Plaintiffs, who were investors to the QLXM

Molecular Separation System technology Defendants were attempting to create and market;

161.    Defendants breached their duty to Plaintiffs when Defendants negligently misrepresented

Defendants possessed technology that could enhance crude oil, purify diesel, refine sour water,

refine bio sludge, remove heavy metals and salts from water, and reconstitute fluids to the

original manufacturer's specifications;

162.    Defendant Michael Branch further breached his duty to Plaintiffs when Defendant

Michael Branch represented to Plaintiffs Defendants possessed active contracts with the United

States Department of Defense, was involved in oil companies such as BP and was closing major

transactions with Middle Eastern Oil Companies for use of this technology;

163.    Plaintiffs were economically and non-economically injured due to this breach;

### ELEVENTH CAUSE OF ACTION
*(Intentional Infliction of Emotional Distress:*
*Extreme and Outrageous Conduct Against All Defendants)*

164.    Plaintiffs incorporate all of the above allegations;

165.    Defendants engaged in extreme and outrageous conduct, including but not limited to,

defrauding Plaintiffs, fraudulently inducing Plaintiffs to invest in a company and technology

Defendants knew or should have known could not fulfill what Defendants represented;

166.    Defendants did so recklessly or with the intent of causing Plaintiff severe emotional

distress;

167.    Defendants' conduct caused Plaintiffs severe emotional distress;

168.    As a direct and result of Defendants' conduct, Plaintiffs have suffered damages in an amount to be proven at trial, including damages for mental suffering;

169.    Defendants' conduct was intentional, malicious, and oppressive, and Plaintiff is therefore entitled to exemplary and punitive damages as well as any and all other damages.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants in an amount which is undetermined at this time, plus interest from the date of the occurrence, or as provided by law, emotional injury, costs in bringing this action, economic loss, non-economic loss, and any other relief which this court might deem appropriate.


PLAINTIFFS REQUEST A JURY TO HEAR ALL ISSUES IN THIS CASE.


Respectfully submitted this 23rd day of January, 2008.


THE LAW OFFICES OF THOMAS V. HOEFLINGER, LLC


s/ *Thomas V. Hoeflinger*
Thomas V. Hoeflinger, Registration No. 37391
Attorney for:
DELL MELLETTE, MARVIN LORD,
LEONARD RICHEY
875 South Colorado Boulevard, No. 754
Denver, CO 80246
Telephone:  303-355-5501
E-mail:  tom@coloradojustice.net

## CERTIFICATE OF MAILING

I hereby certify that on this 23rd day of January 2008 a true and correct copy of the foregoing **AMENDED COMPLAINT AND JURY DEMAND** was sent via U.S. Mail upon the following:


James Leslie Lake, *pro se*
106 Johnson Road
Winona, TX 75792


s/*Thomas V. Hoeflinger*