IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Walker D. Miller

Civil Action No. 07-cv-02065-WDM-KMT

DELL MELLETTE, et al.,

    Plaintiffs,

v.

MICHAEL BRANCH, et al.,

    Defendants.

## ORDER ON MOTIONS TO DISMISS

Miller, J.

This case is before me on Second Amended Motion to Dismiss (doc no 94) filed by Defendants Ford Johnson ("Ford"), Cindy Johnson ("Cindy"), Mark Johnson ("Mark"), John Graves ("Graves"), and JLC Technologies, LLC ("JLC") and the Second Amended Motion to Dismiss (doc no 108) filed by Defendant James Lake, a/k/a Les Lake ("Lake"). Plaintiffs oppose the motions. Upon review of the parties' filings, I conclude oral argument is not required. For the reasons that follow, the motions to dismiss will be granted in part and denied in part.

### Background

This is a securities fraud case, asserting claims under the federal securities laws and Colorado common law. Plaintiffs filed their original complaint in this matter *pro se* on October 3, 2007. After securing counsel in early 2008, the Plaintiffs sought and obtained leave to file a Second Amended Complaint (doc no 93) ("Complaint"), which is now the

operative pleading.

Plaintiffs are all individuals who live in Pagosa Springs, Colorado. Complaint ¶¶ 8-10. The claims arise out of an investment scheme involving ultrafiltration technology supposed to be used in the oil and gas industry. Ford, a resident of Texas, represents himself to be the engineer, owner, and inventor of this technology. *Id.* ¶ 13. Defendant JLC, a Texas limited liability company, is apparently the entity through which the technology was to be promoted. *Id.* ¶ 11. Ford is the Chief Executive Officer and registered agent of JLC. *Id.* ¶ 13. Ford's wife, Cindy, is the Secretary and bookkeeper of JLC and Chief Financial Officer of Management and Enterprises of JLC JN3, an entity tied to JLC. *Id.* ¶ 14. Ford's father, Mark, is the Chief Operating Officer of JLC. *Id.* ¶ 15.

Plaintiffs allege that investors in Pagosa Springs were approached in early 2004 to invest in the technology by use of limited partnerships. Defendant Lake was the original sales and marketing representative for JLC who sought investors there. *Id.* ¶ 16. Under the scheme, separate limited partnerships, called Midas Limited Partnerships, would be created for the purpose of manufacturing and purchasing a single machine, referred to as either a "Midas Unit" or "QLXM Molecular Separation System" ("System"). *Id.* ¶ 63. Defendant Branch, a Pagosa Springs resident and agent of JLC, was the general partner of each partnership. *Id.* ¶ 12. Under the partnership agreements, Branch had sole power to act on behalf of the partnership. *Id.* ¶ 87. Each limited partnership then entered into a Purchase Agreement with JLC to purchase one System. *Id.* ¶ 70. The partnership also entered into a separate Leasing Agreement that would allow JLC to lease the specific machine to a third party, the revenue of which would be shared between JLC and that limited partnership. *Id.* ¶ 71. Branch signed these agreements on behalf of each limited

partnership; Ford signed as agent for JLC. *Id*. ¶ 84. The investors, as limited partners, would receive a percentage of the proceeds based on the amount they contributed to the limited partnerships. *Id*. ¶ 72. Defendant Graves is the attorney who drafted these contracts; he allegedly also served as a sales representative and promotor for JLC and served as an officer for JLC JN4, another associated company. *Id*. ¶ 17. The agreements were identical, save the amount of investment required and serial number of the machine that each partnership was to purchase. *Id*. ¶ 86.

Plaintiffs allege, upon information and belief, that Ford in fact is not the sole inventor of the technology. Rather, Plaintiffs contend that a German national named Karl Heinz Hermann ("Herrmann") patented technology for a high capacity ultrafiltration apparatus in 1989 and 1996. *Id*. ¶¶ 20-21. Herrmann began seeking investors to fund the manufacture of the technology and met Ford in 1999. *Id*. ¶¶ 22-23. Herrmann and his wife formed a close personal relationship with Ford and Cindy. *Id*. ¶¶ 26-28. In June 1999, Herrmann's attorney drafted an agreement signed by Herrmann and Ford whereby Ford agreed to raise $12 million to manufacture Herrmann's technology. *Id*. ¶ 29. Discussions ensued about construction of a plant to produce a prototype; these discussions also involved Mark . *Id*. ¶¶ 33-36. Herrmann built two prototypes in a facility controlled by the Johnson family in Tyler, Texas. *Id*. ¶ 40. However, Ford thereafter sought to amend the contract with Herrmann; negotiations broke down and the business relationship between Ford and Herrmann ended. *Id*. ¶¶ 43-46. Ford did not return the prototypes built by Herrmann or other technical information relating to the filtration systems. *Id*. ¶ 47.

Plaintiffs contend that they were induced to purchase Midas partnerships based on a variety of representations made by Defendants that were false or misleading. In general,

3

the false and misleading statements fall in the following categories:

    a.    Statements indicating that JLC possessed ultrafiltration technology that would enhance crude oil, purify diesel, refine sour water, refine bio sludge, remove heavy metals and salts from water, and reconstitute fluids to the original manufacturer's specifications. *Id.* ¶ 52.

    b.    Statements indicating Ford was the sole engineer, inventor, and owner of this technology. *Id.* ¶ 52.

    c.    Statements indicating that JLC, at the time it sought investments in 2004, possessed active contracts, or was close to securing contracts, with partners in the United States and with foreign companies. *Id.* ¶ 55.

    d.    Statements indicating that Defendants were contractually involved with oil companies such as ConocoPhillips and British Petroleum ("BP"), and the Systems were currently in use purifying oil. *Id.* ¶ 54.

These representations were allegedly made in a variety of contexts and forms, starting in January 2, 2004, when Branch verbally informed Plaintiff Marvin Lord that JLC was offering investors the opportunity to invest in a technology that ConocoPhillips had been using to filter and refine oil. *Id.* ¶ 116. An initial meeting with investors was held on February 27, 2004 in Pagosa Springs, which was attended by Branch, Ford, and Cindy. *Id.* ¶ 117. Plaintiff Lord attended this meeting but it is unclear if any of the other Plaintiffs did. *Id.* ¶ 185. At the meeting, Ford and Branch represented that Ford was the sole inventor and owner of the technology. *Id.* ¶ 118. Ford and Branch also represented that JLC had tested three machines for a period 12 months in Tyler, Texas with ConocoPhillips and that JLC was negotiating a contract with that company, as well as with other

companies, for the lease of the machines. *Id.* ¶¶ 120-21. Ford specifically represented that in the next two months machines would be delivered to ConocoPhillips for use in cleaning slop oil and that machines were currently running successfully with ConocoPhillips. *Id.* ¶¶ 122-23. Ford further stated that 20 initial machines for which JLC sought investment would be used for this on-going contract with ConocoPhillips. *Id.* ¶ 186. Ford promised that investors would receive a return on their investment by August 2004 and a full return within ten months. *Id.* ¶¶ 187-88.

A prospectus was delivered at the February 27, 2004 meeting ("First Prospectus"). *Id.* ¶ 124. Again, it is not specifically alleged that any of the Plaintiffs received or read the First Prospectus. It is also unclear who authored the First Prospectus; Plaintiff appears to assert that Defendants Ford, Cindy, Mark, and Branch are all responsible for the contents of the First Prospectus based on their status as officers and agents of JLC. *Id.* ¶ 124. The First Prospectus contained express representations about Ford's invention of the ultrafiltration technology, specific representations about the capacity of the technology and planned delivery of Systems in February and March 2004 to recover crude oil from slop oil and reconstitute completion fluids used in oil well drilling operations. *Id.* ¶¶ 125-27.

In March 2004, Ford and Branch informed investors that the proposed deal with ConocoPhillips had turned sour because the company did not want to pay the amount sought by Ford for the lease of the machines. *Id.* ¶¶ 190-91. However, in April 2004, Ford informed investors again that contracts with ConocoPhillips were again a reality and that additional money was needed for additional machines to be used for this contract. *Id.* ¶ 192. In a letter dated April 19, 2004, Ford and Branch represented to investors that machines had already been manufactured for the Midas Partnerships and would "be out

5

and working for everyone . . . by the end of May." *Id.* ¶ 130.

Another investor meeting was held on August 21, 2004 in Pagosa Springs, at which another prospectus ("Second Prospectus") was given to investors. *Id.* ¶ 131. The Second Prospectus made various representations about projected income for each System, as well as promises to operate, maintain, and insure each unit. *Id.* ¶¶ 131-135.

In a letter to investors dated August 12, 1004, Branch represented that Ford had shipped four units to Norway and would perhaps ship another 20 before the end of the year. *Id.* ¶ 140. Branch also implied that projects with BP, Shell Oil, PPC, Citco, and the government of Mexico were in discussion. *Id.* ¶ 141.

A letter dated September 27, 2004 [allegedly from Ford, Mark, Cindy, and Branch] informed investors that a deal was completed with Stat Oil in Norway for 60 Midas Systems, involving a five-year contract. *Id.* ¶¶ 142-45. The letter promised certain profits, which Plaintiffs allege they have not received. *Id.* ¶¶ 148-50. However, just a few months later, in December 2004, Branch sent another letter in which he stated that there were problems with the contract negotiations with the Stat Oil deal, which was previously represented as being complete. *Id.* ¶ 153.

In January 2005, a group of investors, not including Plaintiffs, met with Ford in Tyler, Texas. *Id.* ¶ 158. Ford apparently conceded at this meeting that no contracts had been obtained but that deals were expected to come in soon, including placement of three Systems with BP by mid-March 2005. *Id.* ¶¶ 158-59. In February 2005, Ford again met with these investors and again stated that the contracts were moving forward and that some were close to completion. *Id.* ¶ 161.

On March 22, 2005, Defendants Lake, Ford, and Branch held another investor

6

meeting in Pagosa Springs. *Id.* ¶ 163. They again represented that sponsors for the Systems had been secured, licensing fees were imminent, and long-range contracts were close to being finalized. *Id.* A few months later, investors received a May 16, 2005 update from Lake, in which he represented that "another major company has clears [sic] the wa[y] for all of their project managers to begin using JLC Technology to resolve its water issues . . ." *Id.* ¶ 166. This update also contained representations about expected proposals for projects in Middle Eastern countries. *Id.* ¶ 167. Branch made similar representations in a May 16, 2005 email, asserting that JLC had received three program buys for the Systems, including a contract totaling $54 million and that Graves had returned from the Middle East with three clients committed to long term projects with JLC. *Id.* ¶¶ 170-71. In an October 19, 2005 communication, Branch represented to investors that projects in the UAE which had begun in December 2004 had reached completion levels, with the expectation that there would be a build-up of over 600 Systems in the next year. *Id.* ¶ 173.

Plaintiffs contend that despite the purchase agreements, which required manufacture and delivery of each System to certain specifications, none of the Systems ordered by Plaintiffs were ever manufactured or leased to third parties. *Id.* ¶¶ 91, 100-101. In the event that they were manufactured, Plaintiffs assert that they were not insured as promised in the Second Prospectus. *Id.* ¶ 137. In addition, Plaintiffs never received any of the revenue promised from the projects allegedly contracted by JLC using the Systems owned by the limited partnerships. *Id.* ¶ 178.

In 2006, Plaintiffs and others concluded that JLC and Ford were in breach of the agreements and decided that they would be better off attempting to market their Systems on their own. *Id.* ¶¶ 103-110. Accordingly, they entered into Rescission Agreements

7

whereby the Lease Agreements were cancelled and Ford and JLC were released from all liability arising from the prior Lease Agreements. *Id.* ¶¶ 111-113. In consideration for rescission, JLC and Ford promised to deliver to each limited partnership one System, built to specifications, on or before August 21, 2006. *Id.* ¶ 113. Plaintiffs allege that JLC and Ford did not comply with these obligations. *Id.* ¶ 114.

All of the Plaintiffs bought Midas limited partnerships. Lord invested $25,000 in February 2004, $5000 and $35,000 in May 2004, $70,000 in August 2004, and $12,000 in October 2004. *Id.* ¶¶ 189, 197, 199, 207. Plaintiff Richey invested $125,000 in March 2004, $33,660 in July 2004, and $26,360 in July 2004. *Id.* ¶¶ 208, 211, 212. Plaintiff Mellette invested $15,000 and thereafter invested $50,000 in October 2004. *Id.* ¶¶ 213-14.

The Complaint asserts the following causes of action: (1) violation of Section 12a(2) of the Securities Act of 1933 for certain representations contained in the two prospectuses; (2) violation of Section 10(b) of the Securities Exchange Act of 1934, apparently against Ford, Lake, and Branch; (3) civil conspiracy against all Defendants; (4) common law fraud against all Defendants; (5) constructive fraud against all Defendants (plead in the alternative); (6) negligent misrepresentation against all Defendants (plead in the alternative); (7) breach of Lease Agreements against JLC and Ford; (8) breach of Purchase Agreements against JLC and Ford; (9) breach of Rescission Agreements against JLC and Ford; (10) breach of fiduciary duties against Branch; (11) and intentional infliction of emotional distress against all Defendants.

## Standard of Review

Defendants seek dismissal pursuant to Fed. R. Civ. P. 12(b)(6) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4. My function on a Rule

12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiffs' consolidated complaint alone is legally sufficient to state a claim for which relief may be granted. *Pirraglia v. Novell*, 339 F.3d 1182, 1187 (10th Cir. 2003). In general, all well-pleaded factual allegations in the complaint are accepted as true and viewed in the light most favorable to the nonmoving party. *Id*. Here, where defendants' motion also argues that the complaint fails to meet the standards of the PSLRA with respect to the claims asserted under Section 10(b) and Rule 10b-5, I must also consider the strict pleading requirements of that statute and the "inevitable tension" between it and the "customary latitude" granted plaintiffs under Rule 12(b)(6). *Id*.

To state a claim for securities fraud under Section 10(b) and Rule 10b-5, a plaintiff's complaint must contain allegations addressing the following five elements: (1) the defendant made an untrue or misleading statement of material fact; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) the defendant acted with scienter, that is, with intent to defraud or recklessness; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages as a result of his reliance. *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095 (10th Cir. 2003). As further stated by the Tenth Circuit in *Adams*, Section 78u-4(b)(1) of the PSLRA requires plaintiffs to specify the statements by the defendants they allege were misleading, the reasons why the statements were misleading, and, if the allegations in their complaint are made upon information and belief, to state with particularity all facts supporting their belief that the statements were false or misleading. *Id*. at 1087. Section 78u-4(b)(2) of the statute requires that plaintiffs' allegations give rise to a strong inference of scienter. *Id*.

9

Discussion

Defendants seek dismissal of several of Plaintiffs' claims, primarily on the grounds that the allegations of fraud are not sufficient or do not state a claim. I will address the arguments regarding each claim in turn.

1.  Section 12(a)(2) Claim

Section 12(a)(2) of the 1933 Securities Act provides a private cause of action for misrepresentations made in a prospectus. 15 U.S.C. § 77l(a)(2). However, such actions are limited by a one-year statute of limitations and a three-year statute of repose. 15 U.S.C. § 77m. The one-year statute of limitations is triggered by "the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." *Id.* The three-year statute of repose commences at the time of the sale of the security. *Id.*

Defendants argue that Plaintiffs Section 12(a)(2) claim is untimely because it was filed more than one year after the alleged fraud should have been discovered and, with the exception of two transactions, more than three years after the sale of the securities in question. This lawsuit commenced October 3, 2007. I agree with the Defendants that with the exception of Plaintiff Lord's $12,000 purchase and Plaintiff Mellette's $50,000 purchase, both apparently after October 3, 2004, the statute of repose bars recovery for any misrepresentation contained in the prospectuses of February and August of 2004. However, as discussed below, I conclude that the time that Plaintiffs should have discovered the alleged misrepresentation is an issue of fact. Given that Plaintiffs are entitled to favorable inferences on a motion to dismiss regarding this type of factual dispute, I will not dismiss the securities claims on statute of limitations grounds.

Defendants argue that Plaintiffs should have been on notice of the falsity of the claims in the prospectus by late 2004. I note that the 12(a)(2) claim is based on two alleged false statements: (1) that the technology could perform as promised; and (2) that Ford was the sole inventor of the technology. Defendants argue that Plaintiffs should have been placed on inquiry notice when they failed to receive the monetary returns that were promised and from other indications that long term contracts had not, in fact, been secured. This, however, is not directly linked to the alleged misrepresentations, which relate to the viability of the technology and Ford's claim of sole ownership. The Plaintiffs allege that communications from the Defendants continuously reassured them of the promise of the technology and the imminence of business deals. Whether Plaintiffs' reliance on such reassurances was reasonable is clearly an issue of fact. Moreover, Plaintiffs assert that they did not learn about the involvement of the Herrmanns in the invention of the technology until significantly later. Accordingly, I conclude that Defendants are not entitled to dismissal on statute of limitations grounds.

Defendants also argue that Plaintiffs' allegations are not sufficiently specific to comply with the heightened pleading requirements of Fed. R. Civ. P. 9(b) for fraud claims. I disagree. Plaintiffs have identified the two statements contained in the prospectuses upon which this claim is based and have provided adequate information as background to support their reasons for believing that the statements are false. I note that Plaintiffs do not expressly identify whether Mellette and Lord actually received the prospectuses notwithstanding that they allege reliance on the representations contained within them. See Complaint ¶ 223. However, I agree with Magistrate Judge Kathleen M. Tafoya, as she noted in her order granting Plaintiffs leave to file this second amended complaint (doc no

91), that this is more of an issue of proof for trial than a pleading defect.

    2.    <u>Section 10(b) Claim</u>

Defendants also argue that the Section 10(b) claim is also barred by the statute of limitations and statute of repose. However, securities fraud claims under the 1934 Exchange Act are governed by a two-year statute of limitations and a five-year statute of repose. 28 U.S.C. § 1658(b). Given the factual disputes noted above, I conclude that Plaintiffs' Section 10(b) claim should not be dismissed on timeliness grounds.

Defendants further contend that Plaintiffs have failed to comply with the heightened pleading requirements under the PSLRA. Again, Magistrate Judge Tafoya considered this issue in her order and rejected the argument. I do so for the same reasons. With a few exceptions, Plaintiffs have identified the exact statement, the party making it, the time and place and context of the making of the statements, and other details sufficient to place Defendants on notice of the substance of the claim. I also conclude that Plaintiffs have alleged sufficient facts indicating falsity and scienter, including that earlier statements claiming that contracts were secured were later contradicted. I agree with Defendants that where there is a question about authorship, such as with the prospectuses, Plaintiffs may have a problem of proof regarding who should be liable for such statements. However, since the majority of the statements appear to be properly attributed, the claim should not be dismissed.

I note that I construe the 10(b) claim to be asserted against Defendants Ford, Lake, Branch, and perhaps JLC. See Complaint ¶ 227. If Plaintiffs purport to assert this claim against the remaining Defendants, I agree that it is not adequately pled under Rule 9 or the PSLRA and should be dismissed as against Cindy, Mark, and Graves.

3. Common law fraud

Plaintiffs assert their common law fraud claim against all Defendants. Defendants argue that it is not adequately pled under Rule 9, in particular as it relies on "group pleading," i.e., attributing statements to all the defendants. As noted above, I conclude the fraud claim is adequately pled against Ford, Branch, and Lake. It appears that, to the extent these representations were made on behalf of JLC, the claim is also adequately pled against this Defendant. However, Plaintiffs allegations do not identify any misrepresentations made personally by Cindy, Mark, or John Graves. At most, Plaintiffs allege that Cindy was present at one meeting and did not correct her husband's representation that he was the sole inventor of the ultrafiltration technology. Otherwise, Plaintiffs appear to rely on the status of these Defendants as officers and agents of JLC to attribute liability.

Plaintiffs have correctly cited case law to show that where an agent of a principal commits fraud, the principal may be liable. However, Plaintiffs present no legal authority to show that fraud committed by an agent of a principal would also somehow attribute vicarious liability to a different agent of the same principal. Accordingly, I agree that, as currently pled, Plaintiffs have not stated a claim of fraud against Cindy, Mark, or Graves.

4. Constructive Fraud

Plaintiffs have pled in the alternative a claim of constructive fraud against all Defendants. In this context, a critical element of such a claim is the existence of a confidential or fiduciary duty by the defendant to the plaintiff. *Scott System, Inc. v. Scott*, 996 P.2d 775, 780 (Colo. App. 2000); *see also Kim v. Grover C. Coors Trust*, 179 P.3d 86, 98 (Colo. App. 2007). Here, the only Defendant who could possibly have such a legal duty

to Plaintiffs is Branch, as general partner of the Midas partnerships. Accordingly, I agree with Defendants that this claim should be dismissed as to the other Defendants.

     5.    <u>Negligent Misrepresentation</u>

A claim of negligent misrepresentation amounts to the following: "One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." *Keller v. A.O. Smith Harvestore Products, Inc.*, 819 P.2d 69, 71 n. 2 (Colo. 1991) (quoting Restatement (Second) of Torts § 552(1) (1976)). Defendants argue that this claim must be dismissed because it requires that the information supplied by the defendant be used for a transaction involving a third party, other than the defendant. Colorado case law permits a plaintiff to pursue a negligent misrepresentation claim when the false information was used in a business transaction between the plaintiff and defendant. *See, e.g., Keller, supra; First Nat'l Bank in Lamar v. Collins*, 44 Colo. App. 228, 616 P.2d 154 (1980); *see also* CJI Civ. 4th, 9:4. Accordingly, I will not dismiss this claim.

     6.    <u>Intentional infliction of emotional distress</u>

The elements of this tort are: (1) the defendant engaged in extreme and outrageous conduct; (2) recklessly or with the intent of causing the plaintiff severe emotional distress; and (3) resulting in severe emotional distress. *Culpepper v. Pearl St. Bldg., Inc.,* 877 P.2d 877, 882 (Colo. 1994). Outrageous conduct is defined as conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and

14

to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (citations omitted).  To establish the third element, a plaintiff must present evidence that the defendant "engaged in outrageous conduct with the specific intent of causing severe emotional distress" or "acted recklessly with the knowledge that there was a substantial probability that [the] conduct would cause severe emotional distress." *Id.* at 883.

Defendants argue that this claim fails because Plaintiffs' allegations are the same as those forming the basis of the other claims. In addition, they argue that the alleged conduct, even if it actually occurred, does not rise to the level of outrageousness required to establish this claim. I agree. The allegations here establish ordinary financial fraud, not conduct so extreme and atrocious as to go beyond all possible bounds of decency. This claim should be dismissed.

      7.      <u>Civil conspiracy</u>

Defendants argue that there is no federal securities cause of action for conspiracy, or for aiding and abetting a fraudulent securities scheme. It is unclear to me whether Plaintiffs assert a state or federal cause of action in this claim. However, I agree with Defendants that to the extent Plaintiffs seek to assert the conspiracy claim under Section 10(b) or Section 12(a)(2), the claim fails.

The recent decision in *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.,* examines the situation where a defendant did not directly make any allegedly false and misleading statements but was involved in a scheme relating to such statements. 128 S. Ct. 761 (2008). In that case, the Court made clear that a Section 10(b) claim cannot be asserted against "aiders and abettors" of a company's fraud. *Stoneridge*, 128 S. Ct. at 769. Rather, for a secondary actor to be liable, that party's conduct must satisfy all the elements

15

of liability for a Section 10(b) claim, including reliance by the plaintiff upon the defendant's deceptive acts. *Id.* Defendants have also cited case law to support their contention that there is no aiding/abetting or conspiracy liability under Section 12(a)(2). *In re Newbridge Networks Sec. Litig.,* 767 F. Supp. 275, 281 (D.D.C. 1991).

Plaintiffs' argument in response is that they have alleged a "scheme" to defraud, rather than a conspiracy, citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976). *Hochfelder* is inapposite, as it essentially stands for the proposition that a Section 10(b) claim cannot be premised on negligent conduct. In light of the later Supreme Court case law unambiguously disallowing aiding/abetting claims under Section 10(b), Plaintiffs' argument is unavailing. No civil cause of action exists under federal securities law for conspiracy to commit securities fraud. Plaintiffs limit their argument to federal law and make no claim of civil conspiracy under Colorado law. *See* CJI Civ. 4th, 27:1. Therefore, this claim will be dismissed.

        8.      <u>Breach of Lease Agreements</u>

Defendants argue that pursuant to the Rescission Agreements, JLC and Ford were relieved of all liability arising out of the Lease Agreements. I note, however, that Plaintiffs contend they were induced to sign the Rescission Agreements by fraud. In such a case, Plaintiffs may have to elect whether they wish to affirm the Rescission Agreements, thereby releasing the Lease Agreements, or rescind the Rescission Agreements. *Colorado Interstate Gas Co., Inc. v. Chemco, Inc.*, 833 P.2d 786, 793 (Colo. App. 1991) ("One seeking to remedy fraudulent inducement of a contract must elect either to rescind the entire contract to restore the conditions existing before the agreement was made or to affirm the entire contract and recover the difference between the actual value of the

16

benefits received and the value of those benefits if they had been as represented, plus any other damages naturally and proximately caused."). Since claims may be pled in the alternative, it does not appear that Plaintiffs need to choose between enforcing the Lease Agreements or the Rescission Agreements in the Complaint. Accordingly, I will not dismiss this claim at this time.

Accordingly, it is ordered:

1. The Second Amended Motions to Dismiss (doc nos 94 and 108) are granted in part and denied in part.

2. Claim 1 of the Second Amended Complaint (Section 12(a)(2)) is limited to Plaintiff Lord's October 2004 $12,000 investment and Plaintiff Mellette's October 2004 $50,000 investment. Claim 3 (civil conspiracy) is dismissed. Claim 4 (common law fraud) is dismissed as to Defendants Cindy Johnson, Mark Johnson, and John Graves. Claim 5 (constructive fraud) is dismissed as to all Defendants except Defendant Branch. Claim 11 (outrageous conduct) is dismissed in its entirety.

DATED at Denver, Colorado, on March 12, 2009.

BY THE COURT:


s/ Walker D. Miller
United States Senior District Judge